IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **WILLIAM SAKI,** *et al.,*<br><br>        *Plaintiffs,*<br><br>v.<br><br>**CHARLES L. NORMAN,** *et al.,*<br><br>        *Defendants.* | Case No.: 1:26-cv-1148 |

| |
|---|
| **WILLIAM SAKI, JEFFREY WONSER, AND PATRICK CORRIGAN'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Plaintiffs William Saki, Jeffrey Wonser, and Patrick Corrigan respectfully move for a temporary restraining order and preliminary injunction (1) prohibiting Defendants from enforcing their prohibition on vanity license plates with messages that are protected under the First Amendment; and (2) requiring them to approve Plaintiffs' applications for license plates reading "HOMO," "F46 LGB," "LGB F46," "MF TUNDRA," and "MAFIA." As laid out below, Defendants' rules prohibiting those messages violate the First and Fourteenth Amendment rights to free speech and equal protection of the laws.

TABLE OF CONTENTS

Summary of Argument .........................................................................................................1

Issues Presented ................................................................................................................2

Facts ..................................................................................................................................3

Law & Argument ..............................................................................................................4

    I.    Because the BMV's censorship regime violates the First Amendment, Plaintiffs are likely to prevail on the merits. ..........................................................................................4

        A.    The BMV's censorship regime is unconstitutionally vague. .....................4

        B.    The BMV's censorship regime violates the First Amendment because it is unconstitutionally overbroad. ...................................................................7

        C.    Defendants' censorship regime violates the First Amendment because it fails even the most forgiving analysis for mere "reasonableness."..........................................10

            1.    Defendants' censorship regime is not reasonable because its parameters cannot be objectively applied to achieve reasonable ends..............................10

            2.    The BMV's censorship regime is not viewpoint-neutral because it discriminates between promoting and disparaging certain topics. .................12

    II.    Because the remaining prongs are *per se* satisfied when a plaintiff is likely to succeed on a First Amendment claim, the Court should grant injunctive relief. ................................14

Conclusion .......................................................................................................................15

Certificate of Service .......................................................................................................16

### SUMMARY OF ARGUMENT

The BMV has been dodging its First Amendment obligations for more than a quarter century now. After being sued for rejecting a vanity license plate reading "RD RAGE" based on unadministrable criteria in 2001, it agreed to issue that plate and adopt new rules meant to track then-current First Amendment principles. But within a year, it reneged on the settlement, rejecting "RD RA6E," a materially indistinguishable message that was permissible under its new rules. It likewise rejected "RD RAGE 1" through "RD RAGE 9." All those messages remain banned today.

Last year, it was sued again for refusing to issue plates reading "GAY" and "MUSLIM" despite allowing plates reading "NO GAYS" and "BAPTIST." Again, it settled the case with a promise to issue those plates and recommit to its earlier criteria. And again, it reneged on that agreement immediately after the case was closed, rejecting plates with no conceivable basis under its new rules, including "FRUNK1T," "TYPSHH," and "NINASF."

No different than when the program started in 1974, the BMV applies inconsistent criteria when reviewing vanity plates, approving messages one day and then deciding they are forbidden the next. Worse, they apply whatever criteria they do have discriminatorily. For instance, Mr. Saki sought to celebrate Pride Week by registering license plates reading "HOMO," but the BMV refused, despite allowing license plates reading "NO HOMOS" and "HETERO." Gay men are not the only target of the BMV's animus. Its own records demonstrate that they likewise limit access to the vanity-plate program based on race: They reject "BLK POWR" and "BLK POWA" while allowing "WHT POWR" and "WHT POWA" They reject "HONKY" and "WHITEY" while allowing "NIGG3R" and "MULATTO."

Even literal Nazis get to speak more freely than gay men, being granted plates reading "ARYAN," "1488," and "88 NOT Z."

But the government must clear high hurdles to impose limits like this on free speech. Speech restrictions must not be vague or overbroad. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). They must be reasonable, and they must be enforced without respect to the speaker's viewpoint. *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transportation*, 978 F.3d 481, 494 (6th Cir. 2020). The BMV's censorship regime runs afoul of virtually every First Amendment rule it encounters, so the Court should hold that it is unconstitutional, issue a temporary restraining order and preliminary injunction barring the BMV from enforcing it, and order the approval of Plaintiffs' applications.

### ISSUES PRESENTED

1. A rule is unconstitutionally vague if ordinary people cannot understand what it prohibits. The BMV evaluates vanity plates based on individual censors' subjective assessments of how unidentified third parties will perceive the plate. Can ordinary people predict what meaning a bureaucrat will predict that a third party will assign to their license plates?

2. A rule is unconstitutionally overbroad if its potentially impermissible applications are substantial in relation to its plainly permissible applications. The BMV rejects messages on vanity license plates if they "can be perceived" as a profane or sexual or scatological word (or phrase, or abbreviation of a phrase), in any language, when read forward or backward. Are the potentially impermissible applications of such a rule substantial in comparison to its plainly permissible applications?

3. In a nonpublic forum, speech restrictions must be reasonable means of achieving reasonable ends, given the forum's purpose. The BMV created the vanity-plate forum to generate revenue to fund roadside parks, but it rejects application fees from people with messages that may be perceived as profane. Is refusing funding from people who want to say they are a "HOMO" or "NEGRO" a reasonable way to generate revenue for roadside parks?

4. In a nonpublic forum, speech restrictions may not discriminate on the basis of a speaker's viewpoint. The BMV allows drivers to use vanity plates to communicate that they are "WHITE" or "HETERO," but not that they are "NEGRO" or "HOMO." May the BMV create different rules for different races, nationalities, sexual orientations, and religions?

## FACTS

In 2001, the Ohio Bureau of Motor Vehicles settled a First Amendment lawsuit alleging that it gave its censors "unbridled discretion" to reject applications for vanity license plates with an agreement to clarify its standards for approving or rejecting messages on vanity license plates.[1] The standards it adopted as part of that settlement permitted it to reject messages only for three reasons.[2] A message could be rejected if it "Contains words, combinations and/or phrases (in any language and when read either frontward or backward) that":

1. "are profane (that is, swearwords or expletives), obscene, sexually explicit, or scatological."
2. "are so offensive that they could reasonably be expected to provoke a violent response from viewers without additional comment."
3. "advocate immediate lawlessness or advocate lawless activities."

But those criteria have grown more and more relaxed over time. By 2019, the BMV was rejecting not just plates that were actually obscene, but plates that "can be interpreted as obscene." And now, the BMV has returned to its original, wholly subjective test, rejecting countless messages based on "the potential perception of inappropriateness."[3]

Mr. Saki sued over this practice last year, and Defendants agreed to return to that three-prong test in exchange for a dismissal of the case. But they never made good on their promise. When Mr. Saki sought to celebrate Pride Month by registering vanity plates reading "HOMO" and similar phrases, the BMV would not allow them, again deeming the communication of Mr. Saki's sexual orientation to be "Inappropriate / Invalid."[4] Although it would have permitted him to register a license plate that said "HETERO," it has programmed its website to automatically

---

[1] *Zucco v. Caltrider*, No. 2:01-cv-01270 (S.D. Ohio).
[2] ECF #2-56, BMV_000114.
[3] Declaration of Jeffrey Wonser, ¶ 4, ECF #2-51.
[4] Declaration of William Saki, ¶¶ 2–4, ECF #2-63.

reject anyone who attempts to register a license plate reading "HOMO."  It likewise forbids applications for plates reading "FAG," "FAGGOT," "LESBO," and "CUNTY."[5]

Mr. Wonser received the same treatment when Defendants rejected his application for "F46 LGB" because it could potentially be perceived as a criticism of Joe Biden. Mr. Wonser has since attempted to register countless other messages that were also prohibited, including "LGB F46" and "F46 LGB 1." Most recently, inspired by an already-issued license plate reading "MF CADDY," he applied for "MF TUNDRA." Mr. Wonser explained that his message meant "My family's Tundra," but the BMV rejected him again, saying it could be interpreted as a profanity. Mr. Wonser appealed, but the BMV rejected him at every step, based on shifting explanations.[6] Likewise for Mr. Corrigan, who attempted to register a plate reading "MAFIA" but was summarily rejected with no apparent basis.[7]

### LAW & ARGUMENT

**I.     Because the BMV's censorship regime violates the First Amendment, Plaintiffs are likely to prevail on the merits.**

**A.     The BMV's censorship regime is unconstitutionally vague.**

Vagueness can invalidate a law in two separate ways: "First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Morales* at 56.

For instance, in *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 360 (6th Cir. 1998), a union challenged a transit agency's rule against "controversial" advertisements on its buses. The district court held that the rule was not vague because it clearly identified what messages it prohibited by measuring their potential

---

[5] ECF #2-61.

[6] Wonser Decl., ¶¶ 9–15.

[7] Declaration of Patrick Corrigan, ¶¶ 2–5.

effect on the agency's commercial interests. But the Sixth Circuit rejected that analysis, holding that the rule was unconstitutionally vague because it permitted the rejection of ads that "may" affect ridership rather than requiring "demonstrated causality":

> In the absence of … a demonstrable causality between an advertisement's controversial nature and SORTA's interests, the Policy invites "subjective or discriminatory enforcement" by permitting the decisionmaker to speculate as to the potential impact of the controversial advertisement on SORTA's interests.

And because it allowed only "aesthetically pleasing" ads, its policies also failed the other vagueness inquiry, as such a subjective rule "invites arbitrary or discriminatory enforcement":

> Since it is not susceptible to objective definition, the "aesthetically pleasing" requirement grants SORTA officials the power to deny a proposed ad that offends the officials' subjective beliefs and values under the guise that the ad is aesthetically displeasing.

The BMV fails both tests. **First,** a person of ordinary intelligence has no way of knowing what its rules permit and prohibit, because there is no way for them to know which censor will review an application, how that censor will assess the likelihood that third parties will perceive their message as "inappropriate," or how great the potential of such a perception must be to trigger a rejection. Indeed, no one can know what is and is not permitted, because BMV decisions are not based on a message's actual meaning or any *demonstrated* effect it might have, but rather on how unrelated third parties might react to it, asking not what the message says but whether it is subject to a "potential perception of inappropriateness."

**Second,** the BMV's rules authorize and encourage arbitrary enforcement, forbidding many messages for no apparent reason while permitting materially indistinguishable messages. Lists of issued and rejected plates show just how arbitrary the BMV's censors are:[8]

1. "ABC5" is prohibited, but "ABC1" is permitted.

---

[8] *Compare* ECF #2-59 *with* ECF #2-66.

2. "BIGBALR" is prohibited, but "BIGBALL" is permitted.

3. "CUBSROK" is prohibited, but "CUBSW1N" is permitted.

4. "DUMBAZZ" is prohibited, but "AZZ" is permitted.

5. "EAT SMOG" is prohibited, but "SMOG" is permitted.

6. "F0RSALE" is prohibited, but "4ORSALE" is permitted.

7. "GRINDN" is prohibited, but "GRINDR" is permitted.

8. "HATERS" is prohibited, but "HATER" is permitted.

9. "IRISH 9O" is prohibited, but "IRISH 11" is permitted.

10. "JFK 0" is prohibited, but "JFK 5" is permitted.

11. "KNIFE" is prohibited, but "KNIVES" is permitted.

12. "LDYBUGZ" is prohibited, but "LDYBUGY" is permitted.

13. "MAGGIE 0" is prohibited, but "MAGGIE 3" is permitted.

14. "60 NASTY" is prohibited, but "11 NASTY" is permitted.

15. "O3HOG" is prohibited, but "O4HOG" is permitted.

16. "PIGB8" is prohibited, but "PIGDAD" is permitted.

17. "QQQQ" is prohibited, but "QQQQQ" is permitted.

18. "RD RAGE 1" is prohibited, but "RD RAGE" is permitted.

19. "SSSSHHH" is prohibited, but "SSHHHHH" is permitted.

20. "TYPER 69" is prohibited, but "TODD 69" is permitted.

21. "UFOXXX" is prohibited, but "UFOXX" is permitted.

22. "VIOLNTJ" is prohibited, but "VIOLENT" is permitted.

23. "WHO K" is prohibited, but "WHO F" is permitted.

24. "XKX" is prohibited, but "XK72" is permitted.

25. "YU812" is prohibited, but "YU 88" is permitted.

26. "ZOMBIEX" is prohibited, but "ZOMBEEX" is permitted.

**Third,** the BMV's rules authorize and encourage discriminatory enforcement. As laid out in more detail in Section 0, they result in preferential treatment for white drivers over black, straight drivers over gay, and Democratic drivers over Republicans.

This kind of unpredictable and discriminatory enforcement is exactly what the void-for-vagueness doctrine was meant to prohibit. Unshackled from any meaningful guidance, censors

are free to impose whatever rules they want, treating virtually identical messages differently to choke off the speech of disfavored groups. The BMV censorship regime is therefore void for vagueness, and the Court should enter a preliminary injunction barring its enforcement.

> **B.**     **The BMV's censorship regime violates the First Amendment because it is unconstitutionally overbroad.**

"[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Morales* at 52. An overbreadth analysis moves in two steps: "The first step … is to construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008). The second step asks whether the law prohibits "a substantial amount of protected expressive activity." *Williams* at 297, when compared to the law's "plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

The Sixth Circuit's decision in *UFCW* addressed the overbreadth issue, as well, holding that a ban on "controversial" ads was an overbroad solution to the transit agency's goal of attracting and maintaining ridership. Although messages could be "controversial" because of the objective characteristics of the form in which they were presented, the agency's regulations permitted it to reject ads that were controversial "simply because the listener disagrees with the speaker's message":

> A viewpoint challenging the beliefs of a significant segment of the public, however, frequently will generate discord. Thus, an ad's controversy often is inseparable from the viewpoint it conveys. … We therefore can conceive of numerous cases where under SORTA's advertising policy "it is the treatment of a subject, not the subject itself, that is disfavored."

On a facial challenge for overbreadth, then, a court's analysis should turn "not on whether the administrator has exercised his discretion in a content-based manner, but whether

there is anything in the ordinance preventing him from doing so." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992). So even if the BMV had not been abusing its discretion, that would not save its censorship regime from an overbreadth challenge, where the question is instead whether anything *prevents* it from abusing its discretion. On these facts, though, it couldn't survive either analysis, as it rejects messages not because they are objectively problematic in any way, but merely because one of their censors subjectively believes that someone, somewhere, someday might perceive the message as "inappropriate."[9]

That has naturally led to the problems that the overbreadth doctrine was meant to prevent. As laid out above, BMV censors are construing the Guidelines to permit messages carrying certain viewpoints while prohibiting messages carrying opposing viewpoints. And they are also prohibiting all manner of perfectly protected messages based on arbitrary determinations that they are insufficiently unrelated to a topic the BMV has designated as "inappropriate."

Even if the Court were to assume that Defendants could permissibly define "inappropriate" to mean "profane" or "sexually explicit," the BMV has used the "potential perception of inappropriateness" to contort such criteria far beyond meaning. For instance:[10]

- It rejected a license plate reading "FUCK HER."
- But it goes a step further and rejects messages that can reasonably be read to include abbreviations for "fuck," such as "FUSARAH," though that message does not actually contain any profane words.
- Then it goes a step further and rejects strings of characters that have no actual meaning but could reasonably be read to sound profane, such as "PHUQQUE."
- Then it goes a step further and rejects strings of characters that have no actual meaning and *cannot* reasonably be read as profane, such as:

---

[9] Wonser Decl., ¶¶ 4–5.

[10] ECF #2-45, WONSER_001782; ECF #2-6, WONSER_000054; ECF #2-29, WONSER_000670; ECF #2-8, WONSER_000082–83; ECF #2-13, WONSER_000139–44; ECF #2-9, WONSER_000310; ECF #2-22, WONSER_000237; ECF #2-37, WONSER_001298.

- o "DRIVE TF," which they interpreted as "drive the fuck."
- o "FURB," which they interpreted as "fuck you right back."
- o "TNSAF," which they interpreted as "True North Strong As Fuck."
- o "PSYSHIB," which they interpreted as "pussy fucking."
- o "EFORTY6," which they interpreted as "Fuck 46."

At this level of abstraction, the BMV's criteria permit it—or any member of the public who complains—to reject virtually any message. If it can reject "TNSAF" merely because it has at least one letter that it can isolate from its context and arbitrarily assign a forbidden meaning, it can reject literally any message at all, no matter how plainly protected it is by the First Amendment. If they want to encourage fellow drivers to "VOTE," the BMV can reject that message as sexually explicit because it *could* be perceived as meaning "vagina on the erection."

The BMV will undoubtedly argue that such a possibility should be ignored because it has, in fact, issued a plate reading "VOTE," but that fact is irrelevant in an overbreadth analysis, where the question is not whether the BMV *has* adopted overly broad interpretations of its authority to squelch speech, but rather whether there is anything stopping it from doing so. *Forsyth Cnty.,* 505 U.S. at 133 n. 10. Under the current censorship regime, there is not; should Defendants choose to reinterpret *any* issued plate as having a forbidden meaning, there is nothing stopping them from recalling the plate.

By construing its criteria to forbid not only messages that are objectively profane or sexually explicit, but also messages that "can be interpreted" as "inappropriate," the BMV has granted itself unlimited discretion to ban whatever messages it wants. Because those criteria leave room for vast amounts of impermissible censorship—far beyond any "plainly legitimate sweep" the BMV might identify—its censorship regime is unconstitutionally overbroad.

### C. Defendants' censorship regime violates the First Amendment because it fails even the most forgiving analysis for mere "reasonableness."

Plaintiffs maintain that the vanity-plate program is a designated public forum, but regardless of what kind of forum it is, the BMV must be able to establish that its speech restrictions, at a minimum, "are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985).

For instance, in *Am. Freedom Def. Initiative*, a religious group encouraging Muslims to leave Islam challenged a regulation banning "political" advertisements and ads that "scorn or ridicule any person or group of persons" in Detroit's public-transit system. Despite the plaintiff's contention that the advertising program created a designated public forum, the district court granted summary judgment for the transit system, holding that it had instead opened a nonpublic forum subject to far less scrutiny. But the Sixth Circuit reversed, holding that the forum question was irrelevant because in either case, the transit system's rules needed to be at least "reasonable and viewpoint neutral" but were in fact neither reasonable (because they "cannot be objectively applied") nor viewpoint neutral (because the agency offered different benefits for "those that promote [a] group and those that disparage it.").

The same is true here:

### 1. Defendants' censorship regime is not reasonable because its parameters cannot be objectively applied to achieve reasonable ends.

In a nonpublic forum, content-based speech restrictions must be "reasonable," i.e., "the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 16 (2018).

In *AFDI*, the Sixth Circuit clarified that reasonableness is not to be assessed "in the abstract," but instead by considering the purpose of the forum and asking whether the state is

using "reasonable means" to "pursue reasonable ends." There, the court held that even if the ban on political advertisements was adopted to achieve a reasonable goal, it was not a reasonable policy because transit officials couldn't articulate any "objective, workable standards" for determining which ads were "political." Defining the term broadly to include anything "dealing with the structure or affairs of government" would prohibit get-out-the-vote ads, which the agency allowed; meanwhile, defining it narrowly to refer only to things "characteristic of political parties or politicians" likewise yielded inconsistent results. And in the absence of any guidance on what definition to use, agency employees couldn't even agree among themselves what ads were and were not political.

The same problems are present here. Ohio began its vanity license plate program to fund roadside parks.[11] Plaintiffs concede this is a reasonable end, but the BMV's heavy-handed censorship regime is not a reasonable means of promoting it. A license plate that says "HOMO" generates the same amount of revenue for roadside parks as a license plate that says "HETERO," but rejecting it generates *no* revenue for roadside parks.

Nor can there be any "reasoned application," *Mansky* at 23, of a rule prohibiting messages that could be "perceived" or "interpreted" as "inappropriate," as those words could be defined expansively or narrowly or anywhere in between. Inappropriate for what occasion? As perceived by whom? Using what interpretive principles? The BMV never says; it leaves those questions to the discretion of each individual censor. Just as in *AFDI*, this naturally leads to inconsistent results:[12]

---

[11] Am. Sub. H.B. 215, 110th Gen. Assemb., 135 Ohio Laws 71 (1974); Ohio Rev. Code § 5529.05.

[12] Wonser Decl., ¶ 11; ECF #2-1, WONSER_000453; ECF #2-59; ECF #2-59; ECF #2-16, ECF #2-59; ECF #2-28, WONSER_000819; ECF #2-15, WONSER_000360; ECF #2-21, WONSER_000231; ECF #2-11, WONSER_000103.

- The BMV rejected Mr. Wonser and Mr. Saki's application for "F46 LGB" because "F46" and "LGB" could each be perceived as meaning "Fuck Joe Biden," but it has nonetheless issued a license plate that reads "F46" and another license plate that reads "LGB."

- The BMV rejected Mr. Corrigan's application for "MAFIA," but it approved "E4MAFIA," "36MAFIA," and "BMAFIA."

- The BMV rejected "YAOIPLZ" as inappropriate because it referred to *yaoi*, a genre of Japanese literature, but it approved "MRS YAOI."

- The BMV rejected "AXEHOLE" as inappropriate, but it approved "AXE HOLE."

- The BMV rejected "REDRUM8" for referring to murder but approved "REDRUM6."

These cases show the BMV is not using reasonable means to achieve reasonable ends, as it repeatedly takes positions that are diametrically opposed to each other in cases that are materially indistinguishable in terms of generating revenue for roadside parks. On the contrary, the Guidelines *undermine* their own objectives by rejecting revenue from drivers who want to disseminate messages that would have no deleterious impact on funding for roadside parks. Because it is not governed by any objective, workable standards that would advance its goal of funding roadside parks, the BMV's censorship regime is not a reasonable restriction on speech.

> **2.      The BMV's censorship regime is not viewpoint-neutral because it discriminates between promoting and disparaging certain topics.**

"The government may reserve nonpublic forums for speech on certain subjects while banning speech on other subjects. ... But the government may not go further by prohibiting specific viewpoints on the topics that it allows." *Am. Freedom Def. Initiative* at 498.

In *AFDI*, the Sixth Circuit acknowledged that *Matal v. Tam*, 582 U.S. 218, 243 (2017) must be the starting point for analyzing allegations of viewpoint discrimination. There, an Asian rock singer sought trademark protection for "The Slants," the name of his band, but the Patent and Trademark Office refused to register his mark, telling him that he was being too disparaging to Asian-Americans. The Federal Circuit affirmed, holding that because the government was

merely refusing to register a mark, rather than prohibiting the singer from using it, there were no First Amendment issues. But the Supreme Court reversed, holding that having opened up the trademark-registration program to the public, the government could not lock people out just because they have something negative to say:

> To be sure, the clause evenhandedly prohibits disparagement of all groups. It applies equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue. It denies registration to any mark that is offensive to a substantial percentage of the members of any group. But in the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint.

Here, Plaintiffs are likely to succeed on the merits because the record demonstrates that the BMV is prohibiting messages that communicate specific viewpoints, even on topics it permits to be discussed on vanity plates:[13]

- **Politics:** The BMV rejected "FU JRB" but issued "FU DJT."
- **Race:** The BMV will not allow "BLK POWR," "BLK POWA," or "BLK PWR 1," but it will allow "WHT POWR," "WHT POWA," or "WHT PWR 1." It likewise forbids "HONKY" while permitting "MULATTO" and "NIGG3R."
- **Sexual orientation:**
  - The BMV refuses to issue "LESBIAN" but permits "NO GAYS," "IM STR8" and "STR8."
  - The BMV refuses to issue "HOMO" but permits "HETERO" and "NO HOMO."
- **Fascism:** The BMV will not allow "ANTIFA,"[14] but it will allow "ARYAN," "1488," and "88 NOT Z."

These are exactly the distinctions that the viewpoint-neutrality requirement is meant to address. While citizens are debating an issue, the government may not constrain them by imposing a regulatory scheme that "dampens the vigor and limits the variety of public debate."

---

[13] *Compare* ECF #2-59 *with* ECF #2-66; Saki Decl., ¶¶ 18–23; Wonser Decl., ¶ 12.

[14] *Compare* ECF #2-59 *with* ECF #2-66.

*New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). That rule holds regardless of the topic. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 831 (1995) ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint.").

Because it discriminates based on what position drivers wish to communicate on various subjects, the BMV's censorship regime is not viewpoint neutral. And because it is likewise not reasonable, it violates the First Amendment, regardless of whether the vanity-plate program is a nonpublic forum or a designated public forum.

**II.  Because the remaining prongs are *per se* satisfied when a plaintiff is likely to succeed on a First Amendment claim, the Court should grant injunctive relief.**

Although courts typically must evaluate and balance the four familiar factors before granting an injunction, the analysis is far simpler in First Amendment cases like this. Given the unique dangers posed by government restrictions on speech and the law's heavy presumptions against them, the four preliminary-injunction factors "collapse" into the question of success on the merits, asking "whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Cty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002).

For instance, in *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012), a pair of evangelists sought an injunction against regulations prohibiting "soliciting of causes" during the Fairborn Sweet Corn Festival. The district court refused to grant the injunction, holding that the rule was a reasonable restriction on the time, place, and manner of speech. But the Sixth Circuit reversed, holding that even if that were true, the plaintiffs were likely to succeed on the merits

because the City's restrictions were not narrowly tailored to its interest in promoting smooth

pedestrian traffic. And because the plaintiffs prevailed on the First Amendment question, the

Sixth Circuit held they must prevail, as a matter of law, on all the other preliminary-injunction

questions, as well:

> [T]he issues of the public interest and harm to the respective parties largely depend on the constitutionality of the solicitation policy. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. Moreover, if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment. Finally, it is always in the public interest to prevent violation of a party's constitutional rights.

As laid out above, the record demonstrates that Plaintiffs are likely to succeed on the

merits, as the BMV's censorship regime runs afoul of the First Amendment, no matter how the

Court runs the analysis. Plaintiffs therefore satisfy all the other requirements for injunctive relief

under *Cty. Sec. Agency*.

## CONCLUSION

The BMV has empowered its censors with unjustifiably vague and overly broad authority

to silence messages based on guesses of the public's subjective perceptions of those messages.

Given a free hand, those censors are naturally silencing messages based not on whether doing so

will reasonably advance the state's objective of funding roadside parks, but rather on whether

those messages align with the censors' preferred viewpoints. Doing so has injured Plaintiffs by

limiting their ability to disseminate counterspeech in opposition to the speech the BMV has

approved. Because they continue to suffer an injury every day that the BMV perpetuates this

scheme, the Court should hold that its censorship regime violates the First Amendment, enter a

temporary restraining order and a preliminary injunction barring it from enforcing those rules,

and require it to approve Plaintiffs' applications.

Respectfully submitted,

/s/Brian D. Bardwell
Brian D. Bardwell (0098423)
Speech Law, LLC
4403 Saint Clair Ave, Suite 400
Cleveland, OH 44103-1125
216-912-2195 Phone/Fax
brian.bardwell@speech.law
*Attorney for Plaintiffs William Saki, Jeffrey
Wonser, and Patrick Corrigan*

## CERTIFICATE OF SERVICE

I certify that on May 18, 2026, this document was served on opposing counsel by e-mail

and as provided by Fed. R. Civ. P. 5(b)(2)(E).

/s/Brian D. Bardwell
Brian D. Bardwell (0098423)
*Attorney for Plaintiffs William Saki, Jeffrey
Wonser, and Patrick Corrigan*